**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MICHAEL CROOKS, | |
| Plaintiff, | Civil Action No. 13-1614 (BAH) |
| v. | Judge Beryl A. Howell |
| RAY MABUS, *Secretary of the Navy, et al.*, | |
| Defendants. | |

<u>**MEMORANDUM OPINION**</u>

Pending before the Court are cross-motions for summary judgment from the plaintiff, retired Marine Corps Major Michael Crooks, and the defendants, the Secretary of the Navy and Rear Admiral Dee Mewbourne of the U.S. Naval Service Training Command ("NSTC"). Pl.'s Mot. Summ. J. ("Pl.'s Mot.") at 1, ECF No. 23; Defs.' Mot. Summ J. ("Defs.' Mot.") at 1, ECF No. 25. The plaintiff claims he was wrongfully decertified as an instructor in the Navy Junior Reserve Officers' Training Corps ("NJROTC") by the defendant, and seeks vacatur of that decision and reinstatement. *See generally*, Compl., ECF No. 1. For the reasons set forth below, the defendants' motion for summary judgment is granted and the plaintiff's motion is denied.

## I. BACKGROUND

Instructors in the NJROTC program are employees of the school districts in which their units operate as well as responsible to the Navy. *See* Defs.' Mem. Supp. Defs.' Mot. ("Defs.' Mem.") at 5, ECF No. 25. Although the instructors are actually school employees, they are only allowed to remain NJROTC instructors if they retain a valid certification issued by the Navy. *See id.* Thus, a brief summary of the statutory grounds for certification and decertification as an

NJROTC instructor is provided before addressing the factual circumstances specific to this matter.

### A.       The NJROTC Program

Congress has mandated that "each military department . . . establish and maintain a Junior Reserve Officers' Training Corps . . . at public and private secondary educational institutions which apply for a unit and meet the standards and criteria prescribed" by law.  10 U.S.C. § 2031(a)(1).  The Corps' purpose is "to instill in students . . . the values of citizenship, service to the United States, and personal responsibility and a sense of accomplishment." *Id.* § 2031(a)(2).  The Secretary for each branch of service is mandated to (1) "detail officers and noncommissioned officers . . . as administrators and instructors," *id.* § 2031(c)(1); (2) "provide necessary text materials, equipment, and uniforms," *id.* § 2031(c)(2); and (3) "establish minimum acceptable standards for performance and achievement for qualified units," *id.* § 2031(c)(3).  Each Secretary is further required to coordinate administration of the Corps in a "manner that is designed to maximize enrollment in the Corps and to enhance administrative efficiency in the management of the Corps." *Id.* § 2032(a).  Regardless of branch of service, each JROTC instructor "must be certified by the Secretary" of that branch "as a qualified instructor in leadership, wellness and fitness, civics, and other courses related to the content of the program." *Id.* § 2033(a).  Senior Military Instructors ("SMIs") must be "retired officers of the armed forces and . . . serve as instructional leaders who oversee the program." *Id.* § 2033(b)(1).

The specific regulations controlling NJROTC are contained in CNETINST 1533.9K, a 116-page document detailing everything from the organization of NJROTC units and the enrollment of students to information technology and marksmanship training.  *See generally* CNETINST 1533.9K, "Regulations Governing Administration of the Naval Junior Reserve

Officers Training Corps (NJROTC)" ("NJROTC Regs."). The document lists five instances where certification of a NJROTC instructor "will be revoked:"

> a. If the school dismisses the [instructor] or fails to renew the instructors [sic] contract for cause, b. If an instructor resigns without proper notice and without reasonable justification, c. If an instructor resigns while under investigation or to avoid investigation, or d. If an instructor resigns after being advised that their performance will be reviewed by an NJROTC Instructor Certification Board to consider continued certification, or e. Upon consideration of the conduct, performance, and evaluations of an [instructor] by the school and/or designated inspectors, CNET determines that continued certification of the instructor is not in the best interests of the program.

NJROTC Regs. §§ 413(a)–413(e). "An instructor whose certification is revoked under any of the foregoing circumstances may request a review of their case by an NJROTC Instructor Certification Board . . . within 1 year after revocation of certification." *Id.* § 413(f). As this Court has held previously, "the subjective nature of decertification decisions . . . impart[s] considerable discretion upon the . . . Navy." *Foster v. Mabus*, 895 F. Supp. 2d 135, 146 (D.D.C. 2012). With this context, the factual circumstances unique to this matter are related below.

### B.      The Plaintiff's Tenure And Decertification

The plaintiff, Michael Crooks, retired from the Marine Corps in 1994 as a Major "after 20 years of honorable service." Pl.'s Mem. Supp. Pl.'s Mot. ("Pl.'s Mem.") at 1, ECF No. 23-2. Shortly before his retirement from active duty, the plaintiff was "certified by the Navy's Chief of Naval Education and Training [("CNET")] as a [NJROTC] instructor." *Id.* From August 1995 through January 2008, the plaintiff was employed as the SNI at Pearl River High School in St. Tammany Parish, Louisiana. *Id.* at 1–2. The plaintiff received generally positive evaluations, until the 2007-2008 school year. Administrative Record ("AR") at 8–26.[1]

---

[1] The certified Administrative Record in this matter was submitted on September 11, 2014 and is docketed at ECF Nos. 18-2 and 18-3. Each page bears a sequential "Bates" stamp number, which are referenced herein. The AR has been certified by the Department of the Navy as "a true and accurate redacted copy of the administrative files of the Department of the Navy relating to the case of Michael Crooks v. Ray Mabus." Cert. AR at 1, ECF No. 18-1.

Beginning in the 2006-2007 school year, the record indicates that the relationship between the school administration and the plaintiff began to grow strained. *See* AR at 308. In an undated letter summarizing the plaintiff's 2006–2008 tenure at the school, sent to a NJROTC Certification Board, the Principal noted a "constant decline in the number of participants in the NJROTC program" that had been continuing "over the past years" and that the Principal believed threatened the continued viability of the program. *Id.* The Principal attributed the "primary cause" for the program's declining attendance to "the manner in which [the plaintiff] interfaced with cadets in the program." *Id.* In the Principal's view, the plaintiff acted "in the manner of a drill sergeant" by "on numerous occasions, verbally abus[ing] and berat[ing] cadets and non-cadets," such that the Principal felt the need to "counsel[ the plaintiff] about his attitude and confrontational manner." *Id.*

The Principal's letter goes on to note that the plaintiff's attitude and declining enrollment were not the only issues he had with the plaintiff. *Id.* at 309. In 2006-2007, the Principal averred that the plaintiff "did not turn in his lesson plans for August, September or October 2006" despite repeated requests and that "Cadets and their parents" alleged that the plaintiff "was not teaching the approved Navy curriculum but topics that he only had an apparent interest in, such as Suicidal Hand Wringing, Gay Marriage and Black Rednecks and White Liberals." *Id.*

The plaintiff disputes this claim, stating that his lesson plans were posted in the school's new computer system "in a timely manner based on the instructions he was provided" and that the curriculum taught by the plaintiff "is included in the Administrative Record." Pl.'s Opp'n Defs.' Mot. ("Pl.'s Opp'n") at 3, ECF No. 36 (citing AR 197, 257-266). In support of this contention, the plaintiff cites the results of a polygraph test administered to the plaintiff at the plaintiff's counsel's behest stating that the plaintiff asserted truthfully that he did not

"intentionally misstate . . . that [his] lesson plans were posted on the school web site [sic] in a timely manner." AR at 196–97. The record contains a summary of the courses taught in the NJROTC program during the 2007-2008 school year, which makes no reference to the "Suicidal Hand Wringing" mentioned in the Principal's statement. *See id.* at 257–66. Nevertheless, the curriculum does state that Mondays are designated as "Current Events Day," *id.* at 258, and the Principal indicated in his letter that he viewed this teaching of Current Events as "unacceptable teaching" and ordered him "to cease teaching his eclectic 'current events' classes in lieu of the Navy curriculum," *id.* at 309.

Moreover, the Principal asserted that the plaintiff was leaving "students unattended in the classroom" and "leaving campus without receiving permission." *Id.* Combined with the alleged lack of lesson plans and "unacceptable teaching," the Principal initiated a "just cause" hearing in October 2006.[2] *Id.* At the hearing, the Principal averred that the plaintiff "admitted he was wrong" as to all four of the Principal's allegations against him "and promised to correct his errors." *Id.* The plaintiff's employment continued following the "just cause" hearing, but "at the beginning of the 2007-2008 school year, the Assistant Principal and [the Principal] began to receive reports that [the plaintiff] was sleeping in class and again leaving his class unattended." *Id.*

The Principal stated that he and the Assistant Principal "closely monitor[ed] the plaintiff" for a week, beginning on October 15, 2007, just before an "Annual Inspection" of the NJROTC unit was conducted on October 18. *Id.* at 309–10. During this period, the Principal stated he and the Assistant Principal observed several incidents of the plaintiff being away from his classroom, sleeping in class, or otherwise failing to comply with his responsibilities as a school employee.

---

[2] "A 'Just Cause' hearing was a formal counseling to discuss and if necessary correct a deficiency." Pl.'s Opp'n at 2 n.1.

*Id.* Along with the Principal's personal observations of the plaintiff, the Principal noted that the plaintiff had been reporting inaccurate enrollment figures to the Navy, thus concealing the fact that the unit had fewer than the required number of students to maintain the program. *Id.* at 310–11. Additionally, the Principal stated that he was informed by the plaintiff's superior that more than $2,000.00 was lost in potential reimbursement money from the Navy due to the plaintiff's "fail[ure] to utilize" a new reimbursement system on which the plaintiff had allegedly received training in 2006. *Id.* at 311. "This [failure] caused the ROTC parents and students to pay additional fees for ROTC activities." *Id.* Finally, the Principal stated that he did "not feel that [the plaintiff] will improve or that he will provide [the school with] the leadership necessary to be in charge of a successful NJROTC [unit] . . . in the future." *Id.*

During the October 18, 2007 inspection, the Principal informed the plaintiff's superior that the school "would be having a just cause hearing with [the plaintiff] . . . to discuss [his] failure to turn in lesson plans, falling asleep in class, leaving students unattended and other problems taking place." *Id.* at 310. On the same date, the Principal provided the plaintiff with an "NJROTC Instructor Observation Report" ranking the plaintiff "unsatisfactory" in thirteen of fourteen categories of evaluation. *Id.* at 7. The observation report contained handwritten comments from the Principal stating that he had "witnessed [the plaintiff] sleeping in class . . . . [leaving] his students unattended in class for more than half of the class period," failing to turn in lesson plans and "not follow[ing] ROTC curriculum." *Id.*

Less than a month later, the plaintiff's superior officer, Commander Merlin Ladner, provided the plaintiff with an evaluation ranking the plaintiff "Unsatisfactory" in five of six rating categories and "satisfactory" in one category. *Id.* at 6. The evaluation noted that the plaintiff did not meet the physical fitness requirements to maintain his certification because his

height and weight combination fell outside the Navy's standards. *Id.* Ladner's evaluation

further notes that the Principal had received "letters of complaint from cadets and cadets' parents

about [the plaintiff's] performance and negative affect [sic] on the Unit." *Id.* Ladner concluded

by stating he believed the plaintiff's documented "[d]eficiencies . . . are repairable however the

Principal stated he has lost confidence in [the plaintiff's] ability to effectively manage the unit

and is recommending to the Superintendent that he be dismissed." *Id.* Consequently, Ladner

recommended that the plaintiff's "certification be revoked immediately per CNET Inst. 1533.9K,

Article 404e(5) in that his continued certification is not in the best interests of the NJROTC

program." *Id.*

The record contains the plaintiff's detailed rebuttal of Ladner's and the Principal's

evaluations. AR at 42–47. The plaintiff asserted that the Principal did not make any formal

observation of the plaintiff, *id.* at 42, and the alleged sleeping incident was caused by the

plaintiff's temporary prescription medication, *id.* at 44. He contended that when his students

were left unattended, they had been under the supervision of another instructor and he was

unaware that instructor had "allowed them to return to the classroom unsupervised." *Id.* He

asserted that he was unable to submit lesson plans via the school's online system until it became

operational in October and his "lesson plans were posted" at a time when only "thirty-two out of

sixty-one teachers" had managed to upload their plans. *Id.* Noting that the other NJROTC

instructor had not submitted any lesson plans, the plaintiff asserted that he felt "singled out" by

the Principal. *Id.*

In defense of his curriculum, the plaintiff noted that "[o]ne of the goals of [the] NJROTC

curriculum is to promote a healthy lifestyle," and to further that goal the plaintiff "discussed

during [the] health portion of the classes . . . energy drinks, use of sun screens, proper use of

prescription medications, personal image, and how [cadets] are seen by others." *Id.*  The plaintiff contended that these topics were taught and tested "to help improve [the cadets'] overall physical health," "followed the guidelines for the NJROTC syllabus," and "were interesting, thought provoking and applicable in encouraging healthy life styles for these students." *Id.*

As part of his rebuttal, the plaintiff submitted seven "plans for corrective action," ranging from seeking "someone to take over [the plaintiff's] duties in the classroom" when he felt ill to posting his "lesson plans . . . at least a week in advance so that they can be viewed by the administration." *Id.* at 44–45.  Three of the plaintiff's proposed "plans for corrective action" were criticisms of the school administration for (1) failing to follow guidelines regarding investigation of school employees; (2) being held to dissimilar standards from other teachers; and (3) being "unfair[ly] . . . asked to resign as a result of [the October 2007] evaluation." *Id.* The plaintiff further alleged that "the Principal is asking the Navy to remove [him] instead of working through mandated school board processes . . . . [that] would require the principal to defend his decision, justify his inconsistencies and address the fact that school board procedures were not followed." *Id.* at 46.

In a letter from the NJROTC program manager to the plaintiff, dated November 16, 2007, the plaintiff was informed that his "certification as a Senior Naval Science Instructor ("SNSI") in the [NJROTC] program is being revoked due to unsatisfactory marks on [the plaintiff's] Instructor Evaluation and Observation Report," specifically those "in the areas of Program Leadership, Program Instruction, Interpersonal Relationships, Personal Appearance and Program/Records/Administrative Compliance." *Id.* at 2.  "Accordingly, pursuant to NJRTOC regulations, [the plaintiff's] certification as an NJROTC instructor [was] terminated effective 05 November 2007." *Id.*  The letter informed the plaintiff that he could "request a review of [his]

case by an NJROTC Instructor Certification Board, at a regularly scheduled or special convening of the board, within one-year [sic] after termination of [the plaintiff's] certification." *Id.*

### 1. *The Plaintiff's First Certification Review Board*

The plaintiff, through counsel, faxed a letter dated November 26, 2007 to Captain Eric Armstrong in the Office of the Staff Judge Advocate General for CNET, stating that the plaintiff's "instructor certification was revoked without notice and hearing" and alleging that such revocation was "a violation of the Fifth Amendment due process clause, since [the plaintiff] has a legitimate and protected interest in his continued employment." AR at 73. The November 26 letter demanded "a full hearing on the matter consistent with due process and that the revocation be held in abeyance pending the outcome of that hearing." *Id.*

In a letter from NSTC to the plaintiff's counsel, a counsel to NJROTC stated that "NJROTC considers [plaintiff's counsel's] 26 November 2007 letter . . . as a request for reconsideration of the 16 November 2007 decision to revoke [the plaintiff's] certification. Accordingly, [NJROTC] will empanel a board to reconsider the matter promptly after [plaintiff's counsel] provide[s it] with any rebutting information [plaintiff's counsel] believes the board should consider in making its decision." *Id.* at 74. The letter noted that, in NJROTC's opinion, its "decertification process complies with the Fifth Amendment requirements for due process," and that the plaintiff "was provided with full notice of the basis for the decision to consider decertification together with copies of supporting documents and an opportunity to provide both a written statement arguing against decertification and any additional materials that he believed should be considered by the board," which the plaintiff did "by a letter dated 29 October 2007." *Id.*

The record contains five letters reviewed by the reconsideration board from NJROTC cadets and their parents that "appear to relate to both 2006 and 2007" and contain complaints

about the plaintiff.  *Id.* at 85–93.  One of the letters is dated October 23, 2007, *id.* at 93, one is an email dated October 17, 2007, *id.* at 87–88, and three are undated, though one which has no date in the text bears a handwritten date of October 10, 2007, *id.* at 91.  All of the letters complain about the plaintiff's topics or methods of instruction and appear to have been authored by ten then-current cadets and one cadet's mother.  *See id.* at 85–93.  One letter, signed by the "Cadet Executive Officer," noted that the plaintiff took certain actions that "alienated" the cadets, such as "slamming a rod down on tables . . . grabbing cadets by the waist, as well as prodding cadets with the same rod used to slam on tables, [and] calling cadets names such as 'stupid' and 'moron.'"  *Id.* at 89.  Another letter referenced instructors "push[ing], shov[ing], grab[bing], put[ting] their hands around cadets [sic] throats and threaten[ing] to kill, and chalk[ing] it up to kidding around," and the plaintiff "coming inches away from striking cadets [sic] hands with a pointer stick that he has made from an old metallic golf club with the end taken off and replaced with a rubber tip."  *Id.* at 92.

A sixth letter in the record before the reconsideration board is unsigned and bears a handwritten date of January 2, 2008.  *Id.* at 94.  From the letter's contents, it appears to have been authored by Ladner, since it refers to the writer in the first person as being the person who conducted the October 18, 2007 Annual Inspection of the plaintiff's NJROTC unit.  *Id.*  In this summary, the writer notes that during the visit, the "cadets volunteered to me statements about [the plaintiff] that were later validated by the Assistant Principal and Principal to be true."  *Id.*  Among those statements were that the cadets had "submitted a letter [in 2006] to the Principal stating [the plaintiff] was not teaching the curriculum and that they wanted school support," which the writer was told precipitated the plaintiff's first "just cause" hearing in October 2006.

*Id.*  The cadets "stated that [the plaintiff] improved for a time and then went back to doing what he did before."  *Id.*[3]

The writer, likely Ladner, also related that the Principal concluded that the "enrollment [in NJROTC] has continued to decline over the last three years and [the Principal] feels that cadets are leaving the program and new cadets are not joining the program because of the major."  *Id.*  The writer reiterated his conclusion in his "evaluation that all discrepancies could be corrected but once confidence is lost by the school system there is nothing the major could do to recover.  I feel this to be true and unfortunately this proud marine [referring to the plaintiff] must accept that fact that he is no longer welcomed at Pearl River."  *Id.*

The plaintiff submitted an additional rebuttal to the allegations against him in a "Memorandum for the Instructor Certification Board," dated April 13, 2008.  *Id.* at 168–74.  The submission included the results of a polygraph test procured at the plaintiff's counsel's behest, as well as a summary of the plaintiff's private investigator's inquiry into the circumstances leading to the plaintiff's decertification.  *Id.* at 194–201 (polygrapher's report); *id.* at 247–70 (private investigator's report).

The review board affirmed the plaintiff's decertification.  *Id.* at 295.  After reviewing "all available relevant documents including [the plaintiff's] submissions, instructor evaluations from school administrators and NJROTC area managers, investigation reports and all available pertinent correspondence . . . the certification board recommended that [the plaintiff] not retain [his] certification as an NJROTC instructor."  *Id.*

---

[3] Although the record also contains several positive letters supporting the plaintiff's tenure with the NJROTC program, none of those letters appears to have been written by students in the NJROTC program during the time period at issue.  *Id.* at 101–10.  Consequently, their probative value is limited, at best, for the purposes of resolving the instant motion.

The record contains the "NJROTC Instructor Certification Board Reviewer Remarks Sheets" from the members of the Board elaborating on their individual reasons for their decision. The first, from the President of the "April 2008 NJROTC Cert/Decert Board," Captain K. J. Burker, stated that it was with "regret that [he] must recommend that [the plaintiff] be decertified." *Id.* at 287. Burker noted that it was "clear that [the plaintiff] performed admirably during the first part of his tenure," but "there are multiple, recent-years indications and incidents clearly indicating that he is not performing adequately to NJROTC Program requirements." *Id.* Among these incidents were (1) the plaintiff's "[s]ignificant deviation from the prescribed NJROTC Curriculum," especially the plaintiff's "curious selection of certain hot button 'current events issues' . . . [that] bring [the plaintiff's] judgment and Program leadership into question[;]" (2) the plaintiff's gain of "a significant amount of weight (approximately 25 pounds) over the past two years, putting [the plaintiff] out of standards, after an adult lifetime at essentially the same weight," which Burker contended "raise[d] the question whether [the plaintiff] 'lost his professional zeal'[;]" (3) the plaintiff's "documented, repeated classroom absences[;]" (4) the "classroom climate" created by the plaintiff, including "actions perceived as threatening by students, as well as incidents of alleged physical contact [that] are wholly inappropriate and may merit local, police investigation[;]" (5) the plaintiff's "apparent misrepresentation of Program and school student population numbers," which Burker asserted brought the plaintiff's "judgment and integrity into question[;]" and (6) "[t]he non-utilization (and subsequent loss) of available NJROTC budget resources," which "raise[d] additional questions about [the plaintiff's] leadership and management of his unit." *Id.* As for the plaintiff's long history of exemplary performance evaluations relied upon by the plaintiff and his counsel in their submissions to the Board, Burker opined that this "early performance is laudable, but irrelevant to [the plaintiff's]

12

current performance." *Id.* at 288.  Burker concluded that "[g]iven [the plaintiff's] recent

shortcomings in unit leadership and management, the loss in confidence in his leadership by both

the NJROTC Program and (apparently) his unit's host school was predictable . . . . There exists a

vast preponderance of credible indications that [NJROTC] standards have not been maintained,"

thus necessitating the plaintiff's decertification.  *Id.*  A second Board member, who did not sign

his review form or append additional comments, noted on the form that "even [the plaintiff's]

lawyer [admitted the] sleeping incident occurred.  Enough said – no excuse here," and

recommended decertification.  *Id.* at 290.

The third Board member opined that the plaintiff should retain his certification, though

not at Pearl River High School.  *Id.* at 293.  This member, identified by the initials DPH, stated

that the plaintiff's "deficiencies . . . are repairable," and that the school district's "decision to

seek [the plaintiff's] dismissal for cause based on their investigation" was not problematic.  *Id.*

Moreover, the member noted that "from the statements and evidence there seem to be valid

reasons why [the plaintiff] cannot regain the confidence of Pearl River High School

administrators and his employment there [is] untenable," but the member did not "find that the

evidence overwhelmingly finds that [the plaintiff] could not find success at another school."  *Id.*

This third Board member opined that because the plaintiff's deficiencies were "repairable," he

should have been given the opportunity to maintain his certification and seek employment at

another school.  *Id.*

The letter notifying the plaintiff of the Board's decision also advised the plaintiff that he

could "request a reconsideration of the board's decision" if the plaintiff could show that "the

board's action was contrary to law, or involved material error of fact or material administrative

error, or that the board did not have before it for consideration material information." *Id.* at 295. The plaintiff sought reconsideration on July 29, 2008. *Id.* at 313.

### 2. *The Plaintiff's Request For Reconsideration Of The Board's Opinion*

In his request for reconsideration, the plaintiff submitted an additional letter of support of his teaching as well as "a letter of recommendation and an evaluation . . . from [the plaintiff's] present employer, the Recovery School District in New Orleans, LA." AR at 313, 315–17.  The new information also included a decision from a Louisiana administrative law judge finding the plaintiff was entitled to unemployment benefits after he was terminated following his certification revocation. *Id.* at 318–20.

In summarizing the grounds for the request for reconsideration, the plaintiff's counsel wrote to the NSTC Commander that "[t]he information presented to the instructor certification board was sufficient to renew [the plaintiff's] certification." *Id.* at 314.  The plaintiff alleged that the certification board "failed to provide an adequate statement of reasons for their conclusions" and that "[t]he refusal of the Navy to allow [the plaintiff's counsel's] staff to interview key personnel, including Commander Ladner, deprived [the plaintiff] of the due process required by the Constitution." *Id.*  The plaintiff's counsel concluded by stating that the plaintiff "deserves a fair hearing . . . [and] the benefit of the doubt." *Id.*

### 3. *The Plaintiff's Second Certification Review Board*

The Navy constituted another Certification Board, with "two new board members" to consider the plaintiff's request for reconsideration. *Id.* at 435.  This Board again "reviewed all available relevant documents including [the plaintiff's] most recent submissions, instructor evaluations from school administrators and NJROTC area managers, investigation reports and all available pertinent correspondence." *Id.* at 440.  "Based upon [the plaintiff's] performance as a NJROTC instructor, documented in evaluations conducted by school officials and the cognizant

14

NJROTC Area Manager, the certification board upheld the revocation of [the plaintiff's] certification as an NJROTC instructor." *Id.* This decision was "final and [was] not subject to any further appeal or other administrative action." *Id.*

The record contains the reviewer remarks sheets from two board members, George Clifford and Kenneth Liles. *Id.* at 438–49. Clifford recommended that the plaintiff be decertified because the plaintiff "repeatedly demonstrated behaviors that (1) placed cadets at risk, (2) undermined effectiveness of school's NJROTC program, and (3) cast serious doubt on his motivation and suitability for further service in the program." *Id.* at 438. Specifically, Clifford cited evidence that the plaintiff was "[v]erbally abusive towards cadets," and noted "possible instances of physical assault with some sort of stick or baton," as well as "leaving campus without permission, leaving cadets unattended and unsupervised" on "multiple occasions," "[s]leeping in classroom and not being at assigned place (multiple occasions)," "[f]ailing to teach the published naval science curriculum as prescribed in program regulations; teaching 'current events' that apparently centered around potentially volatile, controversial, and/or possibly inappropriate issues," "[f]ailing to submit lesson plans to school administrators," and "[a]llegedly manipulating unit and/or school enrollment numbers from 2002 to 2006." *Id.* (emphasis in original). This evidence led Clifford to the conclusion that the plaintiff "no longer exhibits the motivation, demeanor, and classroom skill to perform effectively as a naval science instructor, and the repeated conduct noted . . . makes him unsuitable for further employment in the NJROTC program." *Id.*

Liles stated in his narrative that the plaintiff had "an initial period of satisfactory performance that deteriorated over time to levels far below both school and NJROTC program standards." *Id.* at 439. Liles rejected the plaintiff's contention that he "was made a 'scapegoat'

for low enrollment," and that, instead, the plaintiff had exhibited "sustained unsatisfactory performance for which [the plaintiff] is solely responsible and accountable . . . ." *Id.* Liles opined that the plaintiff's actions were "directly responsible for plunging the NJROTC Unit at Pearl River High into a posture of anarchy as evidenced by the many and substantiated letters to the principal by his own cadets, who should consider their Senior Naval Science Instructor to be a mentor – not an embarrassment." *Id.* Liles noted that it was "painfully clear that [the plaintiff] is not welcome at Pearl River High and the NJROTC Unit cannot succeed under his leadership, or lack of." *Id.* Moreover, the plaintiff's "established pattern of lackluster to below average to unsatisfactory performance, disdain for the direction of school administrators, refusal to adhere to established regulations and improper administration of the NJROTC program curriculum are alarmingly concrete indicators that his presence would not be tolerated in any high school NJROTC program." *Id.* Consequently, in Liles' view, "[t]he documentation supports the school/district was justified in terminating [the plaintiff's] employment and also supports that he must be De-certified as a Senior Naval Science Instructor." *Id.*

## C.    Procedural History

The plaintiff filed the instant Complaint on October 22, 2013, seeking vacatur of the decertification action and restoration of the plaintiff's certification. Compl. at 7. After receiving three extensions of time to file an answer, Minute Orders January 6, 2014; February 6, 2014; February 13, 2014; four extensions of time to file the administrative record, Minute Orders June 16, 2014; June 27, 2014; July 29, 2014; August 12, 2014; and two motions for extensions of time to file dispositive motions, Minute Orders October 14, 2014; October 28, 2014; the plaintiff filed his motion for summary judgment on December 1, 2014 and the defendants filed their motion for summary judgment on December 2, 2014. *See* Pl.'s Mot. at 1; Defs.' Mot. at 1. After more extensions and a brief stay to allow the parties to address a potential motion to strike certain

16

submissions by the defendant, Minute Order, February 12, 2015, the motions are now ripe for decision.

## II.     LEGAL STANDARD

### A.     Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when the court finds, based upon the pleadings, depositions, and affidavits and other factual materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c); *see Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine issue of material fact exists if the evidence, 'viewed in a light most favorable to the nonmoving party,' could support a reasonable jury's verdict for the non-moving party." *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006)).

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases). Accordingly, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting, in APA case, that "determining the facts is generally the agency's responsibility, not ours"); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) ("Under the APA . . . the function of the district court is to determine whether or not as a matter of law the evidence in the administrative

record permitted the agency to make the decision it did." (quotation marks and citations

omitted)).  Judicial review is limited to the administrative record, since "[i]t is black-letter

administrative law that in an [Administrative Procedure Act] case, a reviewing court should have

before it neither more nor less information than did the agency when it made its decision." *CTS*

*Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal citations and quotation marks omitted;

alteration in original); *see* 5 U.S.C. § 706 ("[T]he Court shall review the whole record or those

parts of it cited by a party . . . ."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985)

(noting when applying arbitrary and capricious standard under the APA, "'[t]he focal point for

judicial review should be the administrative record already in existence . . . .'" (quoting *Camp v.*

*Pitts*, 411 U.S. 138, 142 (1973))).

### B.    Administrative Procedure Act

Under the APA, a reviewing court must set aside a challenged agency action that is found

to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law,"

*id.* § 706(2)(D); *Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d 116, 120–21 (D.C. Cir. 2014)

(citing *Fabi Constr. Co. v. Sec'y of Labor*, 370 F.3d 29, 33 (D.C. Cir. 2004)). The arbitrary or

capricious provision, under subsection 706(2)(A), "is a catchall, picking up administrative

misconduct not covered by the other more specific paragraphs" of the APA.  *Ass'n of Data*

*Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.* (*ADPSO*), 745 F.2d 677,

683 (D.C. Cir. 1984) (Scalia, J.).

The scope of review under the "arbitrary and capricious standard is 'highly deferential,'"

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir.

2013) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008)); *Envtl. Def.*

*Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (same),  and "narrow," such that "a

court is not to substitute its judgment for that of the agency," *Judulang v. Holder*, 132 S. Ct. 476,

483 (2011); *see also Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d

1127, 1135 (D.C. Cir. 2014) (same); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 408 (D.C. Cir.

2013) (same).  Particularly when "an agency has acted in an area in which it has 'special

expertise,' the court must be particularly deferential to [the agency's] determinations." *Sara Lee

Corp. v. Am. Bakers Ass'n Ret. Plan,* 512 F. Supp. 2d 32, 37 (D.D.C. 2007) (quoting *Bldg. &

Constr. Trades Dep't, AFL–CIO v. Brock,* 838 F.2d 1258, 1266 (D.C. Cir. 1988)).  Yet, "courts

retain a role, and an important one, in ensuring that agencies have engaged in reasoned

decisionmaking." *Judulang*, 132 S. Ct. at 483–84. Simply put, "the agency must explain why it

decided to act as it did." *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

In evaluating agency actions under the "arbitrary and capricious" standard, courts "must

consider whether the [agency's] decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S.

360, 378 (1989) (citation and internal quotation marks omitted); *Citizens to Preserve Overton

Park, Inc. v. Volpe* (*Overton Park*), 401 U.S. 402, 416 (1971), *overruled on other grounds by

Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Blue Ridge Envtl. Def. League v. Nuclear

Regulatory Comm'n*, 716 F.3d 183, 195 (D.C. Cir. 2013).  When an agency "'fail[s] to provide a

reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo

its action.'" *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting

*BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)); *see Select Specialty Hosp.-

Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (noting that when "'an

agency's failure to state its reasoning or to adopt an intelligible decisional standard is [] glaring []

we can declare with confidence that the agency action was arbitrary and capricious'" (quoting

*Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994))).  At the very least, the agency must have

reviewed relevant data and articulated a satisfactory explanation establishing a "rational

connection between the facts found and the choice made."  *See Am. Trucking Ass'ns, Inc.*, 724

F.3d at 249 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* (*State Farm*),

463 U.S. 29, 43 (1983)); *see also EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584,

1602 (2014) (holding that agency "retained discretion to alter its course [under a regulation]

provided it gave a reasonable explanation for doing so"); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d

1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an

agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and

capricious agency action." (internal quotation marks and citation omitted)).  "[C]onclusory

statements will not do; an agency's statement must be one of *reasoning*."  *Amerijet Int'l Inc.*, 753

F.3d at 1350 (internal quotation marks omitted; emphasis in original).

     Moreover, when review of an agency's action is "bound up with a record-based factual

conclusion," the reviewing court must determine whether that conclusion "is supported by

substantial evidence."  *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999) (internal quotation marks

omitted); *see also Kappos v. Hyatt*, 132 S. Ct. 1690, 1695 (2012) (affirming review of "factual

findings under the APA's deferential 'substantial evidence' standard"); *Kaufman v. Perez*, 745

F.3d 521, 527 (D.C. Cir. 2014) (noting that agency factual findings may be "set aside . . . 'only if

unsupported by substantial evidence on the record as a whole'" (quoting *Chippewa Dialysis*

*Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir. 2007))); *Dillmon v. NTSB*, 588 F.3d 1085, 1089

(D.C. Cir. 2009) (noting that agency's factual findings may be adopted "as conclusive if

supported by substantial evidence . . . even though a plausible alternative interpretation of the evidence would support a contrary view" (internal quotation marks omitted)).

Notably, "an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706," as does ignoring "evidence contradicting its position." *Butte Cnty.*, 613 F.3d at 194.  As the D.C. Circuit explained, an agency decision "would be arbitrary and capricious" if is not "supported by substantial evidence" because "'it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense.'" *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (quoting *ADPSO*, 745 F.2d at 684)).  Consequently, when assessing whether agency action is arbitrary or capricious, "in their application to the requirement of factual support[,] the substantial evidence test and the arbitrary or capricious test are one and the same."  *ADPSO*, 745 F.2d at 683; *accord CTS Corp.*, 759 F.3d at 59 n.1.

## III.   DISCUSSION

In the instant matter, since the Navy's decision is under review pursuant to the APA, the Court is not free "to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  Deference must be given to the Navy, even when reasonable minds could reach different conclusions.  *See Calloway v. Harvey*, 590 F. Supp. 2d 29, 35 (D.D.C. 2008).  Under this deferential review, the evidence in the record is sufficient to support the defendants' decision and establish "a rational connection between the facts found and the choice made."  *Am. Trucking Ass'ns, Inc.*, 724 F.3d at 249.  The Court first addresses the validity of the defendants' decision before considering the plaintiff's constitutional argument.

### A.    The Decision To Decertify The Plaintiff Is Supported By Substantial Evidence

As the plaintiff acknowledges, the Court's review of a military Board's decision under the APA is limited to determining "whether the Secretary's decision making process was deficient, not whether his decision was correct."  Pl.'s Opp'n at 13 (quoting *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989)).  Most of the plaintiff's arguments are directed to the correctness of the defendants' decision, not the process, and, consequently, are beyond the scope of this highly deferential review.  For instance, the plaintiff discusses extensively whether a polygraph is sufficiently reliable to avoid *per se* exclusion from this Court's review.  Pl.'s Opp'n at 10–13.  This debate is immaterial to review of the defendants' actions here.  No matter whether the polygraph examination results obtained by the plaintiff are admissible in a court of law, these results are part of the administrative record in this case and were presumably reviewed by the two certification boards who rejected the plaintiff's request for recertification.  The fact that the polygraph results did not persuade the two certification boards to change their ultimate decisions does not mean those decisions were unsupported by other substantial evidence.

Nor is it necessary for the defendants to cite explicitly and explain away every point raised in the plaintiff's rebuttal submissions.  *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010) ("When reviewing for substantial evidence, we do not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the [agency's] ultimate decision.").  In general, a court is not to "upset the agency's view of the facts" in an APA review and it must uphold the agency's decision if "[t]he agency . . . explain[s] the evidence which is available" and connects that evidence to the choice made.  *See State Farm*, 463 U.S. at 52.  In the instant matter, although the plaintiff may challenge the implication of several facts found, such as the plaintiff's sleeping in class or being absent from the classroom

while the students were unsupervised, the plaintiff does not challenge the existence of those facts. *See* Pl.'s Opp'n at 2–3. Indeed, the second review board explicitly considered the plaintiff's contention that the Principal "made [the plaintiff] the scapegoat for low enrollment" and rejected it. AR at 439 ("I disagree that [the plaintiff] was made a 'scapegoat' for low enrollment.").

Each of the narratives submitted in conjunction with the Board members' decisions noted that the evidence in the record, as they viewed it, was sufficient to decertify the plaintiff. The only dissenting member from the two Boards convened to review the plaintiff's decertification agreed that the plaintiff could not return to Pearl River High School; he disagreed only with the plaintiff's complete decertification in light of Ladner's observation that the plaintiff's deficiencies were "repairable." AR at 293. The path to the defendants' decision is clear: the Boards considered and credited evidence that the plaintiff fell asleep in class, taught "current events" that were not part of the Navy's curriculum, allowed his "physical readiness" to deteriorate, was "[v]erbally abusive towards cadets," and may have submitted false enrollment figures between 2002 and 2006. *Id.* at 438; *see also id.* at 287–88; 290; 439.[4]

Contrary to the plaintiff's conclusory allegations of being "scapegoated," no apparent evidence of bias is present. In any event, the agency notes that it *did* consider the plaintiff's argument; it just did not credit it. AR at 439. Indeed, the Navy considered the plaintiff's rebuttals, including the letters he submitted in support of his certification and prior performance,

---

[4] In this respect, this case differs significantly from the decision of this Court in *Foster v. Mabus*. No. 11-1931, 2015 WL 2198851, at *12 (D.D.C. May 12, 2015). In that case, the Marine Corps' decision to decertify a Marine Corps JROTC instructor was based on weak, potentially factually erroneous grounds and the plaintiff submitted credible evidence that he was the victim of bias and retaliation that resulted in a pre-determined decision to decertify. *See id.* at *2–7. Rather than considering the potential bias and its effect on the decision to decertify the plaintiff, the agency in *Foster* characterized the issue as "collateral" and concluded that the plaintiff's raising the issue reflected poorly on the plaintiff's ability to continue as an instructor. *Id.* at *8. As a result, the agency in *Foster* "explicitly did not consider an 'important aspect of the problem,'" thus rendering its decision arbitrary and capricious since it was not supported by substantial evidence. *Id.* at *12 (quoting *Butte Cnty.*, 613 F.3d at 194).

but nonetheless reached a decision, based on solid evidence, that the school had "los[t] . . . confidence in his leadership."  AR at 288.  Moreover, given evidence of two years of "indications that [the high] standards [of the NJROTC Program] have not been maintained," the agency determined that it was in the best interest of NJROTC to decertify the plaintiff.  *Id.*

Although the plaintiff faults the April 2008 review board for not considering the plaintiff's submissions, Pl.'s Opp'n at 9–10, the record contains those submissions, the letter notifying the plaintiff of the Board's decision references those submissions, AR at 295, and those submissions were considered in connection with the plaintiff's request for reconsideration, *id.* at 440.  *See also* AR at 488 (Declaration of Commander Kenneth A. Liles, USN (Ret) stating September 2008 Certification Board "consider[ed] information submitted by [the plaintiff]").  Put simply, the evidence the plaintiff presented to the Boards was available for their consideration, but the Boards articulated, based on other solid evidence, a rational explanation for a decision against the plaintiff.  No more is required under the APA.[5]

## B.      The Defendants Afforded The Plaintiff With Due Process

The plaintiff challenges the due process afforded him in conjunction with his decertification, claiming that he "has a liberty and property interest in his employment."  Pl.'s Opp'n at 16.  Assuming, *arguendo*, that the plaintiff has such an interest, he was afforded all the process he was due.  The plaintiff relies upon two cases, *Goldberg v. Kelly*, 397 U.S. 254, 270

---

[5] The plaintiff briefly challenges the defendants' adherence to regulations by stating that the review board based its decision on the "evaluations conducted by school officials and the cognizant NJROTC Area Manager," AR at 295, which the plaintiff contends is not one of the delineated reasons for revocation of certification under the NJROTC Regulations.  Pl.'s Opp'n at 20–21.  The plaintiff is splitting semantic hairs.  Section 404(e)(5) of the NJROTC Regs. states that an instructor's certification may be revoked if "upon consideration of the conduct, performance, and evaluations of an SNSI/NSI by the school and/or designated inspectors, CNET determines that continued certification of the instructor is not in the best interests of the program."  The defendants considered "the conduct, performance, and evaluations of [the plaintiff]," NJROTC Regs. § 413(e), and affirmed the decision to decertify the plaintiff, making clear that the plaintiff's continued certification was "not in the best interests of the program," *id*; *see also* AR at 6 (recommending plaintiff be decertified as "not in the best interests of the NJROTC program").

(1970), and *Greene v. McElroy*, 360 U.S. 474, 509 (1959) (Harlan, J. concurring), as support for the proposition that because the plaintiff's "investigation was initially stymied" and "[c]omplaining witnesses would not talk to the investigators," the Navy violated the plaintiff's right to due process.  Pl.'s Opp'n at 25.  The defendants assert that the plaintiff was given "notice of the intent to revoke his certification and a pretermination opportunity to submit materials for consideration by the deciding official."  Defs.' Opp'n Pl.'s Mot. ("Defs.' Opp'n") at 14, ECF No. 35.  Moreover, the defendants note that the plaintiff's certification was reviewed by two additional certification boards.  *Id.* at 14–15.  The record itself contains transmittal letters to the plaintiff's counsel containing all of the evidence produced by the defendants that was considered in the initial termination decision and by the subsequent review boards.  AR at 5, 74.

*Greene*, on which the plaintiff relies, holds that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."  360 U.S. at 496.  In the instant matter, the record contains no evidence that there was any "testimony of individuals" presented to the decisionmaker in the initial decertification proceeding or before the Boards; rather the entire process proceeded on the basis of paper submissions.  *See generally* AR.  Thus, the Supreme Court's caution about confrontation of witnesses in *Greene*, 360 U.S. at 496–97 ("[T]he accused shall enjoy the right to be confronted with the witnesses against him.  This Court has been zealous to protect these rights from erosion." (internal quotation marks omitted)) is inapposite in this APA matter.  Nor is the plaintiff, a teacher and a Marine Corps officer represented by counsel, the type of individual for

whom the *Goldberg* Court held "written submissions are an unrealistic option."  397 U.S. at 269.[6]

The plaintiff, submitted a detailed rebuttal to the allegations against him prior to his decertification, AR at 42–47, and, with the assistance of counsel, to each of the Boards reviewing the decision, AR at 167–74, 313–14.  As the defendants point out, the "plaintiff received all the administrative review procedures that are available, except for an in-person hearing, and plaintiff does not argue that he was entitled to such a hearing."  Defs.' Opp'n at 15.  The D.C. Circuit has held that "[d]ue process requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 599 (D.C. Cir. 1993).  Thus, even assuming, without deciding, that the plaintiff had a liberty or property interest in his NJROTC certification,[7] the plaintiff's receipt of the evidence against him and his three separate opportunities, of which he availed himself, to submit rebuttal evidence, constitute sufficient due process such that the plaintiff's right to due process under the Fifth Amendment was not abridged.[8]

---

[6] In *Goldberg*, the Supreme Court was referring to welfare recipients "who lack[ed] the educational attainment necessary to write effectively and who cannot obtain professional assistance."  397 U.S. at 269.

[7] Any liberty or property interest in continued certification is questionable, since NJROTC instructor certification "confers no pay or benefits," Defs.' Opp'n at 13, and, in any event, there is "no constitutionally protected entitlement to continued active duty as a commissioned officer" in the armed forces, *Knehans v. Alexander*, 566 F.2d 312, 314 (D.C. Cir. 1977); *Smith v. Harvey*, 541 F. Supp. 2d 8, 15 (D.D.C. 2008) ("[T]here is no constitutionally-protected property interest in continued military service or the employment benefits that come with military service.").

[8] The plaintiff also contends that the standards for decertification are "void-for-vagueness" because there is no "clear standard[] guiding the discretion of [agency] officials" in applying those standards.  Pl.'s Mem. at 20.  This argument was considered, and rejected, in *Foster*, 895 F. Supp. 2d at 145–46.  In *Foster*, this Court held that "the subjective nature of decertification decisions does . . . impart considerable discretion upon the . . . Navy," but "judicially manageable standards exist for reviewing the agenc[y's] exercise[] of discretion."  *Id.* at 146.  The presence of judicially manageable standards and the extensive regulations governing the required behavior of NJROTC instructors, *see generally* NJROTC Regs., provide the "flexibility and reasonable breadth, rather than meticulous specificity," required to further the Navy's interest in providing an efficient and effective program.  *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (internal quotation marks omitted).  The standard applied by the Navy is not impermissibly vague such that a "person of ordinary intelligence" does not have "a reasonable opportunity to know what is prohibited, so that he may act accordingly."  *Id.* at 108.

**IV.      CONCLUSION**

The defendants' decision to decertify the plaintiff as an NJROTC instructor was supported by substantial evidence and the procedures used to effectuate that decertification did not violate the plaintiff's right to due process.  Consequently, the plaintiff's motion for summary judgment is denied and the defendants' motion for summary judgment is granted.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

Date: May 20, 2015

_____
BERYL A. HOWELL
United States District Judge